Beckhaus v. Ladner.

---

The executors of JOSEPH BECKHAUS, deceased,

*v.*

MARY T. LADNER and WILLIAM T. LADNER, her husband.

1. The complainant was sworn and examined as a witness in his own behalf and died before the defendant was sworn, but after she had time and opportunity to be sworn. The action was revived by complainant's executors, and then the defendant was sworn in her own behalf and gave evidence before the master, subject to objection, of transactions with, and statements by, the decedent.—*Held*, such evidence was incompetent.

2. Complainant's bill was founded on a bond and mortgage executed by the defendants to the complainant's testator, and alleged the execution and delivery on the day of their date, prayed answer under oath, without any interrogatory. Defendants, by their answer, admitted the execution, but denied the delivery on the day of execution, and alleged that over three years afterwards complainant procured their delivery by fraud.—*Held*, that this allegation was new matter by way of confession and avoidance, not in response to the allegation of the bill, and was not proven by the affidavits annexed to the answer.

3. A supplemental answer set up that the decedent by his will, read in connection with the circumstances, had treated certain charges on his book against one of the defendants, who was his daughter, as advances to her and had forgiven them.—*Held*, that it did not so appear, but the contrary.

Bill to foreclose.    Final hearing on bill, answer and proofs.

*Mr. David J. Pancoast,* for the complainants.

*Mr. Samuel H. Grey* and *Mr. J. M. Moyer* (of Philadelphia), for
the defendants.

PITNEY, V. C.

The bill, which was filed by Joseph Beckhaus, the testator, in
his lifetime, is founded on a mortgage in the ordinary form, dated
August 21st, 1884, executed by the defendants to the complain-
ants' testator to secure the payment in one year of $14,000, with
interest, according to the condition of a bond of even date exe-
cuted by the defendant William T. Ladner alone to Joseph
Beckhaus.    It was duly acknowledged on the same day, and re-
corded on the 22d of August in the clerk's office of Atlantic
county, in which the lands covered by it lie.

The bill alleges, in the usual form, that at the date of the mort-
gage William T. Ladner was indebted to Beckhaus in the sum
of $14,000, and that the mortgage was given to secure it; it
alleges non-payment of either principal or interest, and prays
foreclosure in the usual form and for answer under oath.

The defendants answer jointly, and allege that at the date of
the mortgage Mr. Ladner had failed in business; that Mrs. Lad-
ner was the owner of the mortgaged premises, and, for the pur-
pose of raising money for the support of herself and child, and
also to assist her husband, caused the bond and mortgage to be
prepared and executed by the parties, and recorded without the
knowledge of the mortgagee, who was her father, and retained
possession of them by herself or her husband without actual de-
livery to her father until about February 1st, 1888 ; that about
a year after their date, and while Mr. Ladner was in prison in
Philadelphia, she handed them to him (Ladner), and while in
his possession he endorsed upon the mortgage the following :

"The within mortgage was executed by Mary A. Ladner and William T.
Ladner for the purpose of covering a debt due to Joseph Beckhaus, No. 1108
Shackamaxon street, Philadelphia, Joseph Beckhaus having loaned Ladner

Brothers twelve hundred dollars in cash, also endorsed for them a note for about forty-two hundred dollars, which was discounted by John Commell, junior, president of Mechanics National Bank. Joseph Beckhaus has never seen the mortgage, and same can only be claimed if the above amount due Mr. Beckhaus should not be returned paid,"

which was signed by the two defendants severally ; that the sums mentioned in this memorandum were afterwards paid by Mr. Ladner to the mortgagee, and the mortgage thereby became nugatory ; that on the 1st of February, 1888, the Commercial National Bank of Pennsylvania recovered a judgment against Mr. Beckhaus for the amount of principal and interest due upon a note made by William T. Ladner for $25,000, dated July 1st, 1884, at three months, to the order of and endorsed by complainants' testator ; that thereupon he sought an interview with Mrs. Ladner, in which he informed her of this judgment, and that its payment would impoverish him and his home would be sold away from him and he driven to the alms-house unless she gave him the mortgage in question ; that he was then seventy-eight years of age and infirm, and his apparent distress affected Mrs. Ladner, and she, believing his statement as to his financial condition to be true, delivered to him the bond and mortgage in question ; that shortly afterwards he asked Mrs. Ladner to execute a paper which, as she understood it, revoked the endorsement on the mortgage, which she did, still relying on the truth of his representations ; that shortly afterwards she discovered that her father's statements were untrue, that he was able to pay the bank judgment without selling his house, and had still left a large estate and lived in a comfortable manner ; and she alleges that the delivery of the bond and mortgage and revocation of the restrictive endorsement were procured from her by fraud.

Mr. Ladner, by a separate clause in the answer, sets up the same defence.

This answer was filed about November 1st, 1888. The testator, then being the complainant, commenced taking depositions in support of his bill, December 17th, 1888, continued on December 22d and January 5th, 1889, when he closed his case. On March 29th, 1889, he took an order on the defendants to

close their testimony in thirty days. The defendants took no testimony until July 31st, 1890. In the meantime, on April 18th, 1889, complainants' testator died, and on May 4th, 1889, the usual order of revivor and substitution of his executors was made.

On the 7th of July, 1890, defendants procured leave to file a supplemental answer, by which they set up that complainants' testator died testate of a will dated January 16th, 1889, by which the money claimed by the complainant in this cause to be due on the mortgage and other moneys are treated as an advancement to Mrs. Ladner of her share in his estate, and that, for that reason, the executors (now complainants) cannot claim the same.

The defendants then proceeded with their evidence.

The facts developed are as follows : The defendant William T. Ladner and his brother Lewis J. were engaged, at and prior to April, 1884, in business as brokers and bankers, in Philadelphia, under the firm name of Ladner Brothers. The complainants' testator was a German, with a limited command of the English language, and was a retired man of business, living in Philadelphia. On the 21st of April, 1884, he endorsed, for the accommodation of Ladner Brothers, a note of that date for $4,189.70, at four months, made by Lewis J. Ladner. On the 1st of July, 1884, and shortly after the Grant & Ward failure in New York, he was induced by William T. Ladner to endorse for their accommodation the firm note of that date for $25,000, at three months, under a sort of promise that it was not to be used unless there should be a run on the Ladner Brothers' bank. The complainants' testator, immediately after signing it, became alarmed and attempted on the same day, in vain, through his wife, to regain possession of it. On the 2d of July he went to Atlantic City to see his daughter, Mrs. Ladner, and her husband, who were living there in her cottage on the mortgaged premises. He saw them on the 3d, and procured a promise from the husband that he would return the note. He also had an interview with the wife alone, in which he stated to her his situation and liability on the $4,189 note and the $25,000 note, and expressed

Beckhaus v. Ladner.

his anxiety on account of it. His daughter, as he swears, and I adopt his statement, declared that he should not lose a cent, that she was worth the seaside cottage, a valuable house and lot in Wallace street, Philadelphia, and personal chattels amounting in all to $85,000, and would make him secure by a mortgage. On the 21st of July Mr. Beckhaus loaned to William T. Ladner his check for $1,200, upon the promise of Ladner that such accommodation would enable him to redeem and return the $25,000 endorsement, but he did not do it. On the 21st of August, the failure of Ladner Brothers being imminent, the bond and mortgage in dispute were executed. On the 24th of August, the note for $4,189 matured, was protested, and complainants' testator was obliged to pay it. On the 25th of August Ladner Brothers made an assignment. Immediately after the maturity and protest of the $25,000 note of July 1st, Mrs. Ladner either brought or sent the bond and mortgage of $14,000, together with her jewelry, to her father, and they were lodged in his private safe. There is some conflict in the evidence whether these securities were then technically delivered or not; that is, whether they were handed to the father and put within his safe as his securities, or whether they were merely left there by the daughter for safe-keeping and subject to her control. I am satisfied that they were actually delivered, and I accept the evidence of Mrs. Herst—Mrs. Ladner's sister—and complainants' testator as to the circumstances attending their deposit in the father's safe, rather than that of Mrs. Ladner, quite independent of the question of the competency of her evidence in that behalf. I think that the making of these securities at the time and under the circumstances cannot be satisfactorily accounted for, except on the basis of their immediate validity in the hands of the mortgagee to secure him for his contingent liability as endorser on the two notes mentioned, and that the actual tradition to him was made as a matter of course in pursuance of the original purpose of the parties.

Shortly afterwards, and, as I infer, after suit brought on the $25,000 note, and after it was determined that it should be defended, Mrs. Ladner, by her father's consent, took away these

securities and kept them until final judgment went against her father on the note, when she again delivered them to him.

Mr. Ladner was arrested, at first in civil actions and afterwards in criminal prosecutions, and spent three or four years in prison. While he was so confined, and in or about the year 1885 or 1886, and not later, and while the suit on the note was pending, he wrote upon the mortgage and signed the endorsement above set forth. The reason why the bond and mortgage were returned to the defendants after their first delivery to the mortgagee, and this endorsement made on the mortgage, is, I think, readily to be inferred from the circumstances, even if there was no direct proof on the subject. Complainants' testator was sued as an accommodation endorser, and whatever defences he had as such would be liable to be narrowed to the extent to which he held collateral against, or was indemnified for his endorsement. He himself spoke and wrote our language with difficulty, and his defence was, at the start at least, managed by Ladner's counsel. If the suit on the $25,000 note could be entirely defeated, the amount due on the bond and mortgage would be reduced to the amount of the $4,189 note and the $1,200 check, and just so much saved to the defendants. The knowledge of the existence of the bond and mortgage was liable to come to the bank either through the record or on examination of the complainant. Hence the endorsement on the bond and mortgage, which, so far as the case shows, was wholly the device of the husband, and made without the knowledge of the mortgagee. But the matter is not left entirely to inference. Mrs. Herst swears that Mrs. Ladner told her that her father had given the bond and mortgage to her to keep until the note case was decided ; and after that decision and when about to redeliver it to her father, she explained the presence of the restrictive endorsement by saying that her husband did it

"because he thought maybe it might be called up in the $25,000 note case, and he wanted the mortgage to appear as if it had been given for this purpose, which is stated on the back."

That these securities were all the while considered as the property of complainants' testator appears clearly enough by the letter of Mr. Moyer (counsel for the defendants), of January 27th, 1885.

About the time of their failure, Ladner Brothers assigned to complainants' testator, as security, a second mortgage for $4,000, on a house and lot in Vine street, Philadelphia; and a share in some real estate at Point Lookout, in Maryland, out of which he realized, altogether, as he swears, $1,925, reducing by so much the amount due upon the note for $4,189 and the check for $1,200. And this is all the proofs show in support of the allegation in the answer that these debts had been paid.

Final judgment went against complainant on the $25,000 note about the 23d of January, 1888.

On the 28th of January Mrs. Ladner delivered the bond and mortgage to her father, first, however, signing the restrictive endorsement on the mortgage, which she appears not to have done until that time. Her father does not appear to have at the moment observed the restrictive endorsement, but did within a day or two, and then wrote her about it, and appears to have threatened to foreclose it. The fact was, that Mrs. Ladner signed that endorsement, in her sister's presence, just before handing the mortgage to her father, and it is probable this fact was communicated to him, and, if so, naturally might have irritated him. In answer to this threat of foreclosure, Mrs. Ladner wrote him a letter begging him not to foreclose it, and using this expression:

"If the article on the back of the mortgage has influenced you in this decision, if Emma [her sister] will procure an affidavit I will sign it, and Will, also, contradicting it."

On the 7th of February the husband, still in prison, made an affidavit, stating that the endorsement was untrue in every particular, and null and void and of no effect; and on the 8th of February Mrs. Ladner made a like affidavit, with a clause, in addition, stating that she was sworn separate and apart from her husband, and made the affidavit voluntarily, freely and without

Beckhaus v. Ladner.

any fear, threats or compulsion from her husband. These affidavits were delivered to her father. Some time afterwards he asked for the policy of insurance on the house to be assigned to him as collateral, and in that connection appeared the first disposition on the part of the defendants to dispute the complainants' testator's right to realize on these securities. On the 29th of April Mrs. Ladner wrote her father that she had attended to paying the insurance, but she did not send the policy. On May 3d she wrote him again, acknowledging the receipt of a letter asking for the policy but not sending it, and saying, "I wish to see you and have a talk about various matters concerning the same." Her husband had now been released from confinement, and it appears that at about the same time the subject of the ownership of the bond and mortgage was raised and talked of between the father and daughter. On May 14th complainants' testator wrote Mrs. Ladner as follows:

"PHILADELPHIA, May 14th, 1888.

"*Dear Mary:*

"I have been waiting patiently for you to fulfill your promise and bring to me the insurance policy assigned to me, the party to whom it lawfully belongs. If I do not receive the insurance policy within the next few days, I will foreclose the mortgage, which will not fail to decide which is the owner of it. I did not expect, nor do I deserve, such treatment from either you or your husband, after having paid his debts, which were yours also, to the amount of $40,000.

"Respectfully yours,
"Jos. BECKHAUS,
"1108 Shackamaxon street."

And in June the bill to foreclose was filed.

Some evidence was given by Mr. Moyer, of the Philadelphia bar, as to conversations had with the complainants' testator about these securities after their first delivery, which are relied upon as admissions on the part of the testator that they had not been delivered to him, but simply deposited in his fireproof for safekeeping and subject to Mrs. Ladner's control. Objection was seasonably made to this—evidence given after the death of complainants' testator—because Mr. Moyer was at the time acting as his counsel and the conversation was confidential. The witness

denied that he was at the time of the conversation acting as
counsel for the complainant, but admitted that he did so shortly
afterwards. In this I am satisfied he was mistaken. His letter
of September 29th, 1884, shows that confidential relations then
existed between the parties, and I am satisfied that that was prior
to the first delivery of the securities and the conversations in ques-
tion. I am also satisfied that from the start the testator under-
stood that Ladner's counsel was his counsel, and talked with him
confidentially. If so, then the evidence was incompetent. The
same may, I think, be said of the evidence of Mr. Shattuck. He
was at first a student in the office of Mr. Colesbury, who was one
of the counsel having charge, under retainer from the testator, of
the defence on the suit on the $25,000 note, and after he was ad-
mitted to the bar he still occupied a desk there, and acted as
assistant to Mr. Colesbury and served subpœnas in the suit on
the note. He swears to certain statements made to him by the
testator in Mr. Colesbury's office when he came there on business
connected with the defence. I think it is to be presumed,
especially after his decease, that he supposed, and had a right to
suppose, that what he said was as sacred as if said to Mr. Coles-
bury. *Haga. Priv. Com. § 36.* But admitting the competency
and reliability of the evidence of both these witnesses, I do not
think it affects the complainant's case in the least. The admis-
sions testified to are all accounted for by the situation of the tes-
tator as defendant in the suit on his endorsement of the note. If
made, they were simply untrue, and there are no facts out of
which an estoppel can arise.

Mrs. Ladner was sworn after the death of her father and the
revival of the suit by his executors and gave evidence, subject to
timely objection by the complainants, of conversations with her
father, notably one in connection with the second delivery of the
securities in January, 1888, and in support of the allegation in
the answer of the false representations on his part as to his
pecuniary situation. This objection raises, so far as I know, for
the first time, one of the questions mooted by Chancellor Green
in discussing the act of 1859 (*Rev. p. 378 § 3*) (still in force ex-
cept so far as modified by the act of 1880), in *Lanning* v. *Lan-*

Beckhaus v. Ladner.

*ning, 2 C. E. Gr. 232,* where he says : " The design of the enactment obviously is, that neither of the parties shall be admitted to testify, unless both can be heard.   It is immaterial whether the suit is originally instituted by or against a party in his representative capacity or whether, by reason of the death of one of the parties, it is revived or continued by or against his representatives.   In either event, if the death occur before the testimony on either side is taken, the evidence of the survivor is inadmissible.   If the death occur after one of the parties has been examined, *questions may arise more difficult of solution,* but which are not involved in the present case."

One of such questions arose in *Marlatt* v. *Warwick, 3 C. E. Gr. 108, 4 C. E. Gr. 444,* namely, whether if one of the parties is examined as a witness and the other dies before being examined, and the suit is continued against his administrator, the evidence of the former is competent to be read at the hearing, and it was held competent.   The question here is the converse of that in *Marlatt* v. *Warwick.*   The party who has been sworn dies before the other has been sworn, and the suit is continued by his personal representative, and the question is as to the competency of the survivor to give evidence as to a transaction with and statement by the decedent.   The act of February 25th, 1880, makes the party a competent witness in such case, with a proviso that the act " shall not extend so as to permit testimony to be given as to any transaction with, or statement by, any testator or intestate represented in said action."

I think the objection to the competency of the evidence was well taken.   At the time Mrs. Ladner was sworn the suit was prosecuted by the present complainants in their representative capacity, and the evidence was given of transactions with and statements by the testator so represented, and is forbidden by the proviso.   The rule is, that the evidence must be competent at the time the witness is sworn.   *Marlatt* v. *Warwick, 4 C. E. Gr. 444; Walker* v. *Hill, 6 C. E. Gr. 191* (at *p. 201*), *7 C. E. Gr. 513* (at *p. 516*).   The object of the exclusive proviso in the act is to promote mutuality and to prevent one of two parties from being sworn as to a particular transaction between them when the lips

of the other party are closed by death. The application of the restriction here works no hardship, since the defendant had ample opportunity to be sworn before the death of the original complainant, and he was not examined at all as to what occurred and was said in connection with the redelivery of the securities to him. To receive the evidence of the defendant on that subject after her father's death would be contrary to the spirit as well as the letter of the act.

It was argued that the proviso in the act extends only to suits which are originally brought by or against a representative, and not to a case where, as here, the suit is brought by and against parties in their own right and one dies pending suit. I cannot adopt this view. I think it is not according either to the letter or spirit of the act, and is covered by the *dictum* of Chancellor Green above quoted.

It was further urged that the objection to the competency of the evidence of this witness was waived by the act of the complainants in introducing in evidence the declaration in writing of the testator in respect to the mortgage in question, found on page 80 of his investment book. That book was called for and introduced by the defendants in support of the allegation that the debt here sought to be enforced had been forgiven by the testator by treating it as an advancement, and was not used by the complainants as an answer to anything sworn to by Mrs. Ladner. I will refer to it again hereafter. For the present, it is sufficient to say, that I see no force in the position taken by the defendants. For these reasons I shall not consider Mrs. Ladner's testimony as to the representations made to her by her father.

Joseph E. Beckhaus, one of the executors, was sworn as a witness after Mrs. Ladner was examined, but he was called and examined by the defendants, and hence his examination does not render her evidence competent, and indeed it was not so claimed.

This leaves the allegation of fraud in procuring the delivery of the bond and mortgage unsupported by any evidence except the oath of Mrs. Ladner annexed to the answer.

Defendants rely upon that as fully establishing it, since the answer was called for under oath, and complainant's testator was

put on the stand without contradicting it.    In dealing with this question it must be borne in mind that complainants are not reading the answer in evidence in another action, nor are they in the position of relying upon it for evidence herein; so that the question does not arise whether they can read a part without reading the whole, and if the whole, then what weight shall be due to each part.    They make out their case, without the aid of the answer, by the production of the bond and mortgage, with the acknowledgment of its execution and delivery by the defendants, and by the production of the instruments revoking the restrictive endorsement found upon it.

The question therefore is, what probative force has this answer for the defendants in support of the issues raised by their answer? It seems to be well settled in England that in a case like the present it has no probative force whatever.    *1 Dan. Ch. Pr.* (*5th ed.*) *\*843; 1 Sm. Ch. Pr. 339; Williams* v. *Williams, 10 Jur.* (*N. S.*) *608.*    In this state, and in New York in the old chancery, the rule seems to be, that so much of the answer as is strictly responsive to the interrogatories put in the bill is evidence for the defendant; that is to say, if the answer to such interrogatories is adverse to the complainant it increases by so much his burden in proving his case; but as to any affirmative matter set up by the defendant by way of confession and avoidance, and not in response to any interrogatory in the bill, it is not evidence for the defendant.    *Miller* v. *Wack, Sax. 209; Stevens* v. *Post, 1 Beas. 408; Hutchinson* v. *Tindall, 2 Gr. Ch. 364; Fisler* v. *Porch, 2 Stock. 247; Green* v. *Hart, 1 Johns. 580; Hart* v. *Ten Eyck, 2 Johns. Ch. 62* (at *p. 89* and *note* at *p. 91*).    The language of Justice Spencer, in delivering the unanimous opinion of the court of errors of New York, and affirming Chancellor Lansing (*1 Johns. 590*), cited by Chancellor Kent, in *Hart* v. *Ten Eyck,* and by Governor Vroom, in *2 Gr. Ch.* (at *p. 565*), seems to me to apply here.    The complainant in that case had charged in his bill generally that the defendant had endorsed over and transferred to him a promissory note for a full and valuable consideration.    The defendant, in answer to this allegation, said it was so endorsed and transferred upon a usurious

Beckhaus *v.* Ladner.

consideration, setting out the usury, and Justice Spencer (at *p. 590*) said :

" The respondent [complainant] was in possession of Johnson's note as endorser, and the fact of the absolute endorsement by Green was *prima facie* evidence of a full and adequate consideration paid for the note. The respondent was under no necessity of inquiring into it, but he did allege that the consideration was a full and valuable one. This the appellant [defendant] might have denied, and had it been incumbent on the respondent, he must have proved his allegation or failed in the suit. The burthen of showing that the consideration was illegal or inadequate, rested on the appellant. When he goes into a charge of usury, he departs from the question put to him, which admitted only of an affirmative or negative answer, and it was wholly immaterial whether it was the one or the other. I view, therefore, the appellant's answer, charging usury, as insisting on a distinct fact, by way of avoidance. The respondents having replied, and given him an opportunity to prove the fact, and he having failed to do so, his answer is no evidence of the fact. This is a well-established principle in chancery proceedings, and will be found recognized in every treatise on evidence in that court."

In the case in hand, the complainant alleges that on the day of the date of the mortgage the defendants executed and delivered it to him. That is the only allegation of delivery found in the bill, and no special interrogatory is administered in reference to it. The answer denies delivery at that time and therein fully answers the allegation of the bill in that behalf, but it goes further and says that several years later complainant procured the delivery of the mortgage by fraud, setting out the fraud. Now, under the rule as laid down in *Green* v. *Hart,* that seems to me to be matter in confession and avoidance, and must be proven.

But if the rule were different, I should be of the opinion that the allegation in question is sufficiently overcome by the well-established facts of the case. Besides, the answer is shown to be untrue in omitting to state the first delivery of these securities to the testator, and also in alleging that the note for $4,189 and

the check for $1,200 had been paid in full, and the cases above ·cited show that such untruthfulness in one respect should render the whole answer valueless.

Another point made and insisted upon was, that Mrs. Ladner ·could not, under the Married Woman's act (*Rev. p. 637 § 5*), become security for her husband in the manner here attempted. ·Counsel admitted that, under our system, a married woman has power to mortgage her real estate to secure her husband's debt, but insisted that the mortgage here was, up to the time of its final delivery, a mere chose in action in her hands, and that the delivery of it by her to her father was a contract of pledge, dis-·tinguishable from the execution of the mortgage, and, therefore, forbidden by the proviso of the fifth section of the Married Woman's act, which forbids the making of a contract of surety-ship by a wife. But the mere delivery of a chattel in pledge is not a contract on her part to do anything. It is an act done and finished, and not an undertaking to do something in the future, and hence not forbidden by the act.

This brings us to the defence set up in the supplemental ·answer, to wit, that the debt to secure which this mortgage was given was discharged by the will of the testator. That instrument (the will) was executed January 16th, 1889, shortly after the complainant's evidence herein was closed. So much of it as bears on the question is as follows :

"*Fourth*. As my daughter Maria A. Ladner has received from me large ·sums of money greater than the shares of my other children, under this · my will, I make no devise to her of any part of my estate, and direct that at no time hereafter shall she or her children receive or be entitled to receive any part or share of the estate hereinafter devised in trust for the use and benefit ·of my daughters Ellie E. Keyser and Emma L. Beckhaus. *Fifth*. As I have advanced to my three children, Ellie E. Keyser, Emma L. Beckhaus and Joseph E. Beckhaus, certain sums of money, and as I desire them, my said three children, Ellie E. Keyser, Emma L. Beckhaus and Joseph E. Beckhaus, to share equally in my estate, I therefore direct that in the division of my estate as hereinafter provided, that the amount of the advances to each of my said three children, Ellie E. Keyser, Emma L. Beckhaus and Joseph E. Beck-haus, shall be added to and form part of my estate in the division thereof, the charges in my investment book against my said three children, Ellie E. Keyser, Emma L. Beckhaus, Joseph E. Beckhaus, to be the only guide in

ascertaining and determining what amount shall have been advanced to each. of my said three children, Ellie E. Keyser, Emma L. Beckhaus and Joseph E. Beckhaus. I direct that the rest, residue and remainder of my estate, together with the said several amounts advanced to my said three children, Ellie E. Keyser, Emma L. Beckhaus and Joseph E. Beckhaus, to be divided into three equal parts." * * *

In order to show that a security, valid upon its face, held by a testator or intestate at his decease against one of his children, is not to be inventoried and enforced as such by his personal representative, it must clearly appear that the decedent, either in his lifetime or by his will, treated it as a gift and advancement to his child on account of or in full of the child's share in his estate. In the case in hand I find no such evidence outside of the will itself, but much to the contrary. The decedent, at the moment of making his will, was prosecuting the enforcement and collection of this bond and mortgage with vigor. He was seeking to recover and reclaim so much of the moneys which he had paid as surety for his son-in-law as was covered by these securities, and he continued the prosecution, after making his will, by procuring an order in the cause requiring the defendants to close their testimony. This is, of course, entirely inconsistent with the idea of a gift in advance of a part of his estate.

Nor does the language of the will show any such intention. He speaks, in the fourth item, of moneys *received* from him by Mrs. Ladner, and does not use the word "advance" in that connection. While, in the fifth item, he says : "I have *advanced* to my three other children " &c. He then directs that his estate shall be divided among these three children, the *advances* to each to be added to his estate and deducted from the several shares, so as to equalize them. All this is in marked contrast with the language used in dealing with Mrs. Ladner.

Defendants' counsel, however, argue that the will must be construed in view of the situation of his estate at its date, and of the fact that the bond and mortgage was not then collected or even credited on his books to Mrs. Ladner, and they insist that his language indicates that he did not expect or desire any return of any part of the moneys he had paid to her, and further, that if

Beckhaus *v.* Ladner.

the bond and mortgage shall ·be collected, it will make her share less than that of her brothers and sisters, and contravene the intention of the testator in that respect.   The moneys which the testator paid for Mr. Ladner are found charged against Mrs. Ladner on his investment book, which was produced by the complainants on the call of the defendants and put in evidence by the defendants.   The first item is, " 1872, October 1.· To cash for furniture &c., $6,748.20."   This was admitted by him, on the witness-stand, to be a gift and advance to her on her marriage, and is undoubtedly an advance of the same character as those charged against his other children on the same book.   The remaining charges are all for moneys paid, with the exception to be mentioned directly, either on account of his liability as endorser for the Ladners or for the expenses of advice about and defending suits thereon, and may be summarized as follows :

| | | |
|---|---:|---:|
| Principal and interest on note for $4,189 | $4,210 | 58 |
| Check | 1,200 | 00 |
| Judgment on the $25,000 note | 30,371 | 97 |
| Items of charges for counsel fees and disbursements | 3,119 | 10 |
| | $38,901 | 65 |
| Received from Vine street mortgage and Point Lookout land | 1,925 | 00 |
| | $36,976 | 65 |
| Other items are— | | |
| Paid Mr. Taylor, of Camden | 238 | 69 |
| Taxes on the mortgaged premises | 68 | 10 |
| Taxes on the mortgaged premises | 53 | 54 |
| Item of 1872 | 6,748 | 20 |
| | $44,085 | 18 |

I have put down the credit for moneys received from the Vine street mortgage and Point Lookout property at $1,925, because Mr. Beckhaus gave those figures on the witness-stand.   The entries on his book do not amount to so much.

No proof was offered as to the value of the mortgaged premises here in question and the probability of their realizing sufficient to pay the condition of the bond with interest.   The inference from the circumstances would be that they were given for the full value of the premises.   But treating them as suffi-

cient, and the bond and mortgage as good for their face with interest, and giving a credit accordingly, and taking no account of interest on either side, there would still remain nearly $30,000 due.

I have eliminated from the charges on the testator's book certain items arising out of the receipt by the testator of the proceeds of the sale of the Wallace street house, and which proceeds have been accounted for and settled. The total of the charges on the book, including these items against Mrs. Ladner, is $53,487.75, and the credits, not including the bond and mortgage, are $10,627.65, and there is an entry of January 17th, 1889, the day after the date of the will, "Balance, $42,860.10," some $1,200 less than I have made it. This difference is probably accounted for partly by the fact that Mrs. Ladner claimed from the executors and received from somebody, as claimed by her counsel, payment of a balance of moneys in testator's hands remaining from the proceeds of the sale of the Wallace street house, and which she claimed could not be held by way of offset against this mortgage, and partly by the difference in the credit due from the collaterals above alluded to. The balance of $44,000 is subject to a reduction of $665 received by the complainants as a dividend upon a claim against the assignee of the Ladners.

Turning to the inventory and final account of the complainants as executors, I find that the three favored children have received, on their several shares of the estate, including the advances to each, the sum of $13,062, and there remains to be divided certain real estate which I give at the appraisements of the defendants' witnesses, but which I infer from the entries of rents received on the investment book to be more than can be realized for them :

| | |
|---|---|
| Carriage factory | $28,000 00 |
| Stable | 5,000 00 |
| Property purchased under foreclosure of the Lund mortgage | 4,400 00 |
| Ladner mortgage | 14,000 00 |
| | $51,400 00 |

Or $17,000 for each of the three children, which would make the share of each $30,000, if the real estate brings at sale the prices above named and the mortgage here in question produces its face. If, however, the Ladner mortgage is not paid, the amount of dividend still to be paid to each will be nearly $5,000 less. The result is, that unless Mrs. Ladner is compelled to pay this mortgage, she will receive from her father's property over $40,000, and her brothers and sisters only about $26,300 each, while if she does pay it they will receive each about $30,000 and she but little short of that sum. It thus appears that the enforcement and collection of the mortgage will result in a division of testator's property, among his four children, much nearer equal than its non-enforcement and non-collection will produce. So that an examination of the condition of the estate shows nothing in aid of the defendants' contention now under consideration, but much against it.

The complainants on this part of the case, and in reply to the evidence of the defendants, referred to page 80 of the testator's investment book, where he has entered in his own handwriting, among his investments, the bond and mortgage in question, and has given their history. An examination of the book shows that, on the pages containing entries of other investments, the testator has, whenever they have been paid or transferred, or otherwise disposed of, so stated at the bottom of the entry, and that the entry as to Mrs. Ladner's bond and mortgage stands without any such memorandum. Objection was made to this entry as evidence, but I think it plainly competent on the ground not only that it is an entry in a book produced by the defendants and upon the same subject-matter about which it was produced, but because it is a declaration made by the decedent showing his intention upon the very point in issue, namely, did he or not, at his death, intend that this bond and mortgage should be treated as a part of his estate and enforced as such? It seems to me that the entry, in the condition in which it is found, tends to show his mind on that subject and is competent and valuable evidence. If the testator, when he made his will, intended to forgive Mrs. Ladner this debt, it seems to me he would have

manifested it in unmistakable terms, would have marked the investment off his book, have delivered up the bond and mortgage to be canceled, and, above all, would not afterwards have procured, as he did, an order in the case against her to close the testimony.

It may be that the enforcement of this bond and mortgage will work hardship on Mrs. Ladner, but it must be borne in mind, in that connection, that suit was not brought on it until she had (inspired, no doubt, by her husband) disputed her father's right to do so, and then, after suit brought, instead of throwing herself on the mercy of her father, she put in, and swore to, an answer charging him with practicing a fraud upon her.

I will advise a decree for complainant. As no payments have been made on the bond, and it is confessedly much less than the amount it was intended to secure, there is no occasion for a reference.